J-A10027-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BROOKWORTH PARTNERS, L.P. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| FRANKFORD MACHINERY, INC., NICHOLAS KASHKASHIAN, JR., AND RONALD KASHKASHIAN | |
| Appellees | No. 2967 EDA 2016 |

Appeal from the Order Dated August 23, 2016
In the Court of Common Pleas of Delaware County
Civil Division at No(s): 2013-08010

BEFORE: DUBOW, J., SOLANO, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SOLANO, J.:                    **FILED SEPTEMBER 26, 2017**

Appellant Brookworth Partners, L.P., appeals from the judgment entered in favor of Appellees Frankford Machinery, Inc., Nicholas Kashkashian, Jr., and Ronald Kashkashian in Appellant's action claiming a fraudulent transfer in violation of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S. §§ 5101-5110. After careful review, we affirm.

Frankford Associates, Inc., though no longer an entity and not a party to this litigation, is central to Brookworth's claim. Frankford Associates was a Pennsylvania corporation which began operating in 1966. Trial Ct. Op., 11/29/16, at 4. It was a family business founded by Arson Kashkashian, who was the sole shareholder until his death. N.T., 4/14/16, at 59. Arson had two

sons who became involved in the business, Ronald Kashkashian and Nicholas Kashkashian, Sr. *Id*. Ronald was initially a salesman for Frankford Associates; after Arson's death in 2006, he became a shareholder, director, and officer; and after Nicholas Sr.'s death in 2009, he became president. *Id.* at 22, 59-60. Nicholas Sr. had two sons, Nicholas Kashkashian, Jr. and Eric Kashkashian, who succeeded to his ownership interest in the company. *Id.* at 60. By 2011, Nicholas Jr. was an employee, shareholder, director, and officer of Frankford Associates. *Id.* at 60, 63-64.[1]

Frankford Associates' main business was servicing commercial dry-cleaning equipment and selling replacement parts for such equipment. Trial Ct. Op. at 5. It had four employees, including a parts manager, two service technicians, and a receptionist. N.T. at 23, 63. By the 1990's, Frankford Associates had also begun selling turn-key dry-cleaning operations, for which it would guarantee leases of rental properties. *Id.* at 23, 25, 62.[2] This aspect of its business accumulated significant debts. *Id.* at 43-45; Brookworth's Ex. 11 (bankruptcy schedules showing $938,068.31 of debt was primarily comprised of commerical real estate leases).

---

[1] Ronald testified that Nicholas Jr. was a 25% shareholder of Frankford Associates at the time of trial. N.T. at 23. However, the 2011 federal income tax return for Frankford Associates (covering the period July 1, 2011 through June 30, 2012) shows that Ronald and Nicholas Jr. were both 50% owners of Frankford Associates the year it went out of business. Brookworth's Ex. 5.

[2] Ronald Kashkashian described this portion of the business as "industry package plants where they would take a lease on a particular property, build out the facilities, find a buyer." N.T. at 23.

In 2002, Ronald and Nicholas Sr. opened defendant-Appellee Frankford Machinery, Inc., another Pennsylvania corporation. N.T. at 24.[3] Its main area of business was selling commercial dry cleaning and laundry equipment, for which Ronald would solicit customers "door to door." *Id.* at 24-25, 59, 78. Both Ronald and Nicholas Jr. are now employees, directors, and officers of Frankford Machinery. *Id.* at 58, 82-83, 148. Ronald owns 50% of the company, and Nicholas Jr. owns 25%. *Id.* at 58.[4] Ronald is president. *Id.*

Both businesses maintained their respective corporate offices and warehouses at 4500 Torresdale Avenue in Philadelphia, where they shared such common business resources as a telephone number, receptionist, stationary, and computers. Trial Ct. Op. at 4-5; N.T. at 30. Both businesses were insured by a single common property and casualty commercial insurance policy. Trial Ct. Op. at 5. They filed separate tax returns, used separate billing systems, and used separate letterheads. N.T. at 80-81. The businesses served many of the same customers, Trial Ct. Op. at 5, and the two companies would often refer customers to each other — for example,

---

[3] At the time that it opened, Ronald and his brother were the only two employees of Frankford Machinery. N.T. at 24. It is unclear how many employees Frankford Machinery has subsequently employed.

[4] Eric Kashkashian, Nicholas Jr.'s brother, owns the remaining 25% of Frankford Machinery, but is not active in the business. N.T. at 58.

Frankford Machinery would refer customers who needed their equipment repaired to Frankford Associates. N.T. at 79-80, 155-56.

Brookworth is a landlord (or a successor in interest to a landlord) under a commercial lease agreement for which Frankford Associates was guarantor. Trial Ct. Op. at 2. After Brookworth's tenant (Frankford Associates' customer) defaulted on the lease, Brookworth sued Frankford Associates and obtained a judgment in the amount of $249,100 on June 5, 2011. *Id.*

In mid-August 2011, Brookworth executed on a bank account belonging to Frankford Associates and collected $117,422.60 against its judgment. Trial Ct. Op. at 2. Frankford Associates then began borrowing money from Frankford Machinery in order to continue operating. *Id.*

On December 31, 2011, Frankford Associates closed. Trial Ct. Op. at 3 At that point, it owed Frankford Machinery $133,000. *Id.* Frankford Associates transferred its remaining physical property, including office furniture and fixtures, a van, a truck, office computers, and old or used dry cleaning or laundry equipment, to Frankford Machinery for a loan reduction of $83,000. *Id.*; N.T. at 65-69. After December 31, 2011, Frankford Machinery began to service commercial laundry and dry-cleaning equipment and sell replacement parts (the business in which Frankford Associates had engaged). *Id.* at 81.

On February 25, 2013, Frankford Associates filed for bankruptcy. Trial Ct. Op. at 3. Brookworth was listed in the proceeding as one of Frankford Associates' unsecured creditors, as was Frankford Machinery. *Id.* The bankruptcy schedules listed one asset: receivables due from "Premier Cleaners" in the amount of $13,207.33, which was indicated to be in litigation; they listed liabilities of $938,068.31. Brookworth's Ex. 11. On May 21, 2013, the appointed bankruptcy trustee filed his final report with the bankruptcy court. Trial Ct. Op. at 4. The report confirmed that there was no property available for distribution to creditors, *id.*; the amount due from Premier Cleaners was described as an abandoned asset. Defendants' Ex. 2. The trustee's report was adopted by the court, and on June 3, 2013, the bankruptcy proceedings were concluded. Trial Ct. Op. at 4.

On July 15, 2014, Brookworth filed the complaint in the instant case.[5] In the complaint, Brookworth claimed that Frankford Associates violated the PUFTA when it transferred "assets" to Frankford Machinery after Frankford Associates was insolvent (or was rendered insolvent by the transfer), at a time when Brookworth was a creditor of Frankford Associates, and without receiving reasonably equivalent value from Frankford Machinery. Compl., 7/15/14, at ¶¶ 25-28. Brookworth alleged that the assets were transferred "to insulate Franklin [*sic*] Associates from the claims of creditors such as

---

[5] Brookworth initiated the case on August 14, 2013, and conducted pre-complaint discovery.

- 5 -

Brookworth" and "to give Franklin [*sic*] Machinery the control and benefit of the assets, property and business of Franklin [*sic*] Associates." ***Id.*** at ¶¶ 29, 33. The complaint did not specifically describe what assets were transferred, except to specify that Frankford Machinery succeeded in the use of the website "*frankfordonline.com*." ***Id.*** at ¶ 20.[6] The complaint also did not give a specific timeframe for the alleged transfer of assets. The complaint claimed that Ronald and Nicholas Jr., as shareholders, officers, and directors of both companies, acted "with intent to hinder, delay and defraud Brookworth and other creditors." ***Id.*** at ¶ 38.

Frankford Machinery and the Kashkashians responded on July 31, 2014. They denied that any assets had been transferred from Frankford Associates to Frankford Machinery except those tangible assets listed on the bill of sale from December 31, 2011. Response, 7/31/14, at ¶ 28. They also asserted that the website *frankfordonline.com* had always served both companies, although the companies are separate and distinct. ***Id.*** at ¶ 20.

A non-jury trial was held on April 14, 2016. In Brookworth's opening statement, its counsel stated that Brookworth intended to prove that on December 31, 2011, Frankford Associates possessed intangible assets which "stayed in the room" after its business closed, and were thus fraudulently transferred to Frankford Machinery in violation of the PUFTA. N.T. at 9, 13-

---

[6] Other allegations included in the complaint which were abandoned at the time of trial or appeal have not been included here.

14. In his opening statement, counsel for Frankford Machinery and the Kashkashians argued that the evidence would show that no intangible assets changed hands on December 31, 2011, or at any other time; that the two companies were separate and distinct; and that neither Frankford Machinery nor Ronald or Nicholas Jr., as principals of Frankford Machinery, are liable for the debts of Frankford Associates. *Id.* at 16-19.

At trial, Ronald Kashkashian testified that after Brookworth executed on the Frankford Associates bank account on August 15, 2011, that company was financially depleted and forced to borrow money from Frankford Machinery in order to keep operating. N.T. at 61. He agreed that by December 31, 2011, Frankford Associates was no longer able to pay its financial obligations and owed more than the company "had available to use to make payments." *Id.* at 32. When asked whether Frankford Associates was insolvent as of December 31, 2011, Ronald responded "yes." *Id.* at 31. Ronald was not asked on what date Frankford Associates first became insolvent.[7]

Ronald denied that Frankford Associates transferred any intangible assets to Frankford Machinery, including good will[8] or a customer list, and

---

[7] Ronald testified that Frankford Associates never received the money it was owed from Premier Cleaners (the sole asset listed on its bankruptcy schedules), as that company also went into bankruptcy. N.T. at 71.

[8] Brookworth's expert later defined "good will" as "time in business, reputation in the marketplace and so forth." N.T. at 104.

stated that because the customer lists for the two companies had been virtually identical, the Frankford Associates customer list had no value for Frankford Machinery. N.T. at 76, 80, 84-87. Ronald testified that after December 31, 2011, Frankford Machinery did begin to sell replacement parts for commercial dry-cleaning equipment, as Frankford Associates had done. *Id.* at 81. He said that it was a small component of Frankford Machinery's business, and that "because Frankford Associates was no longer in business, it almost became something that we had to do because Frankford Associates was no longer there." *Id.* When asked whether Frankford Machinery was selling parts to the same customers that had been Frankford Associates' customers before it went out of business, Ronald testified, "Well that would be speculation, but there might be some cross over, correct. Most of these clients were outside of the area so there [is] no way of determining, very few." *Id.* at 50.

Brookworth introduced a screenshot of a page on the *frankfordonline.com* website from 2013. N.T. at 47-49; Brookworth's Ex. 12. The top of that page listed the contact details for Frankford Machinery. *Id.* After a list of links for various services, the bottom of the page stated, "Also . . . be sure to check out our parts website at . . . *frankfordparts.com*," and it included links to that website. *Id.*

Ronald testified that Frankford Machinery had used its own website, *frankfordparts.com*, for many years. N.T. at 48. Frankford Machinery did not

begin using *frankfordonline.com*, the website created for Frankford Associates, until 2012, after Frankford Associates had gone out of business. *Id.* at 50, 53. Ronald believed any income since generated from that website to be nominal. *Id.* at 77, 85. Ronald was unsure who owned either website. *Id.* at 50.

Nicholas Jr. testified that he created *frankfordonline.com* in 1999. N.T. at 149-50. He was listed as the registered owner, but the website was created for the promotion of Frankford Associates, who employed him at the time. *Id.* at 150. In 2007, after Frankford Machinery was in existence, Nicholas Jr. created the website *frankfordparts.com*; he did so in his own name "and then maybe Frankford Associates at that time." *Id.* at 150. Frankford Machinery has used the *frankfordparts.com* website since 2009, when Nicholas Jr. became a partial owner of that company. *Id.* at 151.[9] Nicholas Jr. stated that only the *frankfordparts.com* website generates sales. *Id.* at 151-52.[10] Nicholas was not asked at what point Frankford Machinery began to use *frankfordonline.com*, or whether the ownership and registration of that website ever changed. He also was not asked if Frankford Associates had ever used *frankfordparts.com* to generate sales, or whether the ownership and registration of that website ever changed.

---

[9] It is unclear if Frankford Machinery used the website prior to 2009.

[10] In 2011, the site generated around $10,000 of sales for Frankford Machinery, and that number has consistently increased by roughly 20% a year. N.T. at 152.

Robert Gerber, the accountant for both Frankford Associates and Frankford Machinery, testified that in mid-July 2011, Frankford Associates stopped its revenue-generating activities. N.T. at 133-34, 139-40. After that time, Frankford Associates continued with the "collection of receivables, payment of payables, sales taxes, payroll taxes." *Id.* at 139. Mr. Gerber was not asked why the company stopped its traditional business-generating operations in mid-July, prior to the depletion of its cash account.

Mr. Gerber stated that if Frankford Associates or Frankford Machinery owned any intangible assets, they were not listed on the companies' balance sheets or tax returns. N.T. at 139-40, 146. Frankford Associates did not keep a perpetual inventory,[11] and the assets listed on its internal documents and tax returns were inaccurate and were often carried over from numbers given to Mr. Gerber by Nicholas Kashkashian, Sr. *Id.* at 134-35. Regarding good will, Mr. Gerber testified that the name "Frankford Associates" might have had some value, but also "the name Frankford was attached to a lot of businesses during the 12 years. There was Frankford Dry Cleaners that were licensed under the name Frankford. There was Frankford Machinery, so people knew the name Frankford." *Id.* at 140.

---

[11] Mr. Gerber did not explain the concept of a perpetual inventory. One court has explained that such a system offers a running summary of inventory items on hand by maintenance of individual accounts for each class of goods. **See Alexandre of London, Washington, D.C. Corp. v. Indemnity Ins Co. of N. Am.**, 182 F. Supp. 748, 752 n.3 (D.D.C. 1960). We provide this explanation solely to clarify our narrative; it is not part of the evidence in the record.

Brookworth introduced Frankford Machinery's customer lists from 2010 (4 pages), 2011 (9 pages), and 2012 (18 pages). N.T. at 38-39; Brookworth's Ex. 9.[12] Brookworth introduced a "schedule of gross receipts and gross profit," which showed Frankford Machinery's 2009 and 2010 gross receipts were $1,807,688 and $1,636,627, respectively, while its 2011 and 2012 gross receipts were $1,319,693 and $2,402,062, respectively. Brookworth's Ex. 8. Frankford Machinery's 2009 and 2010 gross profits were $8,300 and $20,627, while the 2011 and 2012 gross profits jumped to $85,986 and $633,290. *Id.*

Brookworth offered the testimony of P. Dermot O'Neill, CPA, an expert on the topic of business valuation and financial forensics. N.T. at 89-92. Mr. O'Neill was asked to testify as to the value of the intangible assets which may have been transferred by Frankford Associates.

Mr. O'Neill testified that there are three different approaches to evaluating a company's intangible assets, but that two of them — the "asset approach" (based on appraisals) and the "income approach" (based on forecasts generated from accounting documents) were not available here. N.T. at 95-96.[13] Mr. O'Neill therefore utilized the "market approach," which

---

[12] Each full page listed approximately 25 customers. N.T. at 38-39.

[13] Mr. O'Neill believed the "income approach" was unavailable because the underlying accounting documents needed to generate the forecasts were unreliable and because he needed to depend on management to make the projections. N.T. at 95-96, 108.

is typically used in bankruptcy situations. *Id.* at 96. This approach uses a guideline developed from other, similar companies — in this case wholesalers of equipment sold in service industries — which suggested that the approximate "market value of invested capital" of such companies was the product of .45 multiplied by the company's annual revenue. *Id.* at 96.[14]

In this case, using data from Frankford Associates' income statement for the period from July 1, 2010 through June 30, 2011,[15] the "market value

---

[14] The market value of invested capital is considered the "value of the company as a whole." N.T. at 104.

[15] Regarding the source of this data, Mr. O'Neill testified:

> Q: And sir what is the source of that financial information?
>
> A: The source of that financial information is shown back in the income statements.
>
> Q: Or was it the tax return?
>
> A: Oh it would be the tax returns.
>
> Q: So you looked at the tax return for the period ending – for 2011 you would have to have looked at the 2010 tax return for Frankford Associates?
>
> A: Correct, that is illustrated on Exhibit B.

N.T. at 101. However, "Exhibit B" to the expert's report is not the 2010 federal income tax return for Frankford Associates (which was not entered into evidence), but a compilation of historic income statements for the years ending on December 31 of 2010, 2011, and 2012. Brookworth's Ex. 13 at 9. The numbers used in the expert's calculations appear to be drawn from exhibits "C" and "D" of his report, which reflect the historic income statements for the years ending on June 30 of 2010 and 2011. Brookworth's Ex. 13 at 10-11

of invested capital for Frankford Associates was $868,785. N.T. at 101, 104; Brookworth's Ex. 13 at 4.[16] To that total, Mr. O'Neill added $53,791 of liabilities to find the "estimated fair market asset value" for the company;[17] in this case that value was $922,576. N.T. at 104; Brookworth's Ex. 13 at 4. From that number, Mr. O'Neill subtracted $72,976 in operating cash and $192,743 of accounts receivable, which left approximately $657,000. N.T. at 104; Brookworth's Ex. 13 at 4.[18] Mr. O'Neill testified (and his report reflects) that this figure represents the estimated fair market value for the combination of Frankford Associates' inventory, fixed assets, and intangible assets. N.T. at 104, 106; Brookworth's Ex. 13 at 4. Inconsistently, however, Mr. O'Neill also testified, and his report elsewhere suggests, that this figure represents the fair market value of the intangible assets alone. N.T. at 98, 99; Brookworth's Ex. 13 at 5.

Mr. O'Neill stated that the market approach does not give a breakdown of what comprised the $657,000. N.T. at 97.[19] He stated that a breakdown

---

[16] This number represents .45 times $1,930,634, the amount of gross sales in 2010. The market value of invested capital is the same as the equity in this case, as Frankford Associates had no interest bearing debt. Brookworth's Ex. 13 at 4.

[17] "In other words it is the old accounting equation[:] the assets equal liabilities plus equity." N.T. at 109.

[18] The exact number was $656,857; Mr. O'Neill referred both to this number and to $657,000.

[19] Nevertheless, his report broke down the sum of $657,000 into estimated intangible assets of (a) $341,000 for "customer-related intangibles," (b)

*(Footnote Continued Next Page)*

of the intangible assets would require a forecast or projection that could not be done in this case from the data available to him. *Id.*

Mr. O'Neill testified that the loss of Frankford Associates' cash as a result of the execution on its bank account on August 15, 2011, would not have reduced the enterprise value of the company under the market approach. N.T. at 102-03, 107-09.[20] However, he stated that if the amount of cash and accounts receivable had changed in July or August, it would have impacted the estimated fair market value of the tangible and intangible

*(Footnote Continued)* ———————————

$250,000 for workforce in place, the website, and goodwill, and (c) cash deposits totaling $66,000. Brookworth's Ex. 13 at 5. The report did not explain the basis for this estimated breakdown.

[20] Mr. O'Neill testified as follows:

> Q. If $117,000 or the total amount of money available to the company was taken out of the company a month after the date 6/30/11 would this have a substantial impact on the valuation **of the company** going forward?
> . . .
> A. Cash on hand no . . .

N.T. at 102 (emphasis added). When asked whether the change in operating cash in August 2011 would "affect the method evaluation you selected as among the asset approach, income approach, or market approach," Mr. O'Neill responded,

> Whether or not a thousand dollars of cash or ten thousand dollars of cash or a million dollars of cash went in or out would not impact that million dollars, it is still going to be a million dollars because **that is the value of the business** if you will, what we call that enterprise value.

*Id.* at 107-09 (emphasis added). Mr. O'Neill repeated that he would still have applied the market approach, rather than the asset or income approach, to estimate the value of the company's assets, despite the reduction in cash. *Id.* at 109.

assets. *Id.* at 110.[21] When asked whether his opinion would change "if the opinion was provided as of June 30, 2012," or after the company discontinued all activity, Mr. O'Neill responded that a valuation after discontinuance of business activity would not be done under the market approach (which contemplates an on-going business), but under the "liquidation premise of value." *Id.* at 101, 104-05, 114-15.

On June 16, 2016, the court found in favor of Frankford Machinery, Nicholas Kashkashian, and Ronald Kashkashian. The court concluded: (1) Frankford Machinery was not liable for any alleged transfer made by Frankford Associates, because the two entities are separate and distinct,

---

[21] His testimony was:

> The Court: Knowing that this event took place[,] the execution on substantially all the cash assets of Frankford Associates took place in [August] of 2011, would that have impacted either negatively or positively **the valuation you have calculated at page four of your report?**

> Mr. [O'Neill]: Well as you see on page four of the report I did subtract cash and accounts receivable that existed as of June 30th [(to find the combined value of tangible assets, intangible assets, and inventory)]. Now under normal business operations your accounts receivable would go down, your cash would go up in collecting receivables and so forth. So there was some consideration. Now any variance would be a reduction from the [$922,576], the total estimated fair market value assets. So if there was a variance between the [$265,719 (the amount of cash and accounts receivable as of June 30, 2011)] and what happened in July or August **then that would impact** that estimated fair market value [of the combination of tangible assets, intangible assets, and inventory].

N.T. at 110 (emphasis added).

"[n]on-transferees cannot be liable for alleged fraudulent conveyances" under the PUFTA, and a "purchasing or receiving company is not responsible for the debts and liabilities of the selling company"; (2) no claim could lie against Nicholas Kashkashian and Ronald Kashkashian because the complaint did not allege and no evidence established that any assets were transferred to them as individuals; (3) Brookworth failed to carry its burden of proving that Frankford Associates was insolvent on December 31, 2011; and (4) Brookworth failed to carry its burden of proving the (a) existence or (b) value of any intangible assets on December 31, 2011. *See* Trial Ct. Op., at 17-20 (citations omitted).

Brookworth filed a timely appeal, and presents the following question:

> Did the lower court commit legal error and/or abuse its discretion, by rendering a Decision in favor of [Frankford Machinery, Nicholas Kashkashian and Ronald Kashkashian] and against Brookworth, when the Decision was contrary to the weight of the trial evidence and/or trial admissions by [Frankford Machinery, Nicholas Kashkashian and Ronald Kashkashian], and Brookworth had proffered, at the non-jury trial, clear and unrebutted evidence which proved both liability and damages in this statutory fraudulent transfer claim?

Brookworth's Brief at 3.[22]

We have held:

> The general rule for a grant of a new trial on the basis that it is against the weight of the evidence allows the granting of a new trial only when the jury's verdict is contrary to the evidence as to shock one's sense of justice and a new trial is necessary to

---

[22] Brookworth preserved this claim in a motion for post-trial relief filed on June 29, 2016, and denied on August 22, 2016.

rectify this situation. . . . [T]he appellate court, in reviewing the refusal to grant a new trial, ordinarily considers all of the evidence. The court is not required to consider the evidence in the light most favorable to the verdict winner when passing on the question of whether a verdict is against the weight of the evidence. Rather, the court is to view all of the evidence.

*Lanning v. West*, 803 A.2d 753, 765-66 (Pa. Super. 2002). In addition:

In prior matters involving review of alleged fraudulent conveyances, we have stated that our standard of review of a decree in equity is particularly limited and that such a decree will not be disturbed unless it is unsupported by the evidence or demonstrably capricious. The findings of the [judge] will not be reversed unless it appears the [judge] clearly abused the court's discretion or committed an error of law. The test is not whether we would have reached the same result on the evidence presented, but whether the [judge's] conclusion can reasonably be drawn from the evidence.

*Fell v. 340 Assocs., LLC*, 125 A.3d 75, 81 (Pa. Super. 2015) (citation omitted), *appeal denied*, 140 A.3d 13 (Pa. 2016).

Brookworth claims that the weight of the evidence produced at trial established that Frankford Associates transferred intangible assets to Frankford Machinery, and repeatedly describes these assets as "workforce in place, customer lists, internet presence and goodwill." Brookworth's Brief at 5-6, 12, 15.

Brookworth contends that the lower court erred in focusing on December 31, 2011, as the date of the transfer of intangible assets.[23] Brookworth claims that "by December 31, 2011, Frankford Associates no

_____

[23] Brookworth claims "Brookworth did not contend that the transfer date was December 31, 2011," Brookworth's Brief at 22.

longer had any intangible assets to be valued, because it had transferred them to Frankford Machinery." Brookworth's Brief at 19. Brookworth states that it was "unable to pinpoint the exact date when the Frankford Associates intangible assets were transferred to Frankford Machinery." *Id.* at 17. It asserts that the transfer happened "sometime between July 14, 2011 and December 31, 2011," *id.* at 7, 12-13, 22, but "most likely by July 14, 2011," when Frankford Associates ceased generating revenue and Frankford Machinery began to generate income from the business activities that historically were done by Frankford Associates. *Id.* at 15-17, 20.[24]

Brookworth relies on Mr. O'Neill's testimony that the value for the intangible assets was $657,000 on June 30, 2011, and that this value had not changed by, or following, the date of transfer. Brookworth's Brief at 6. Brookworth points to Mr. O'Neill's testimony that the reduction of cash in mid-August would not have affected the valuation of intangible assets, *id.* at 6-7, and that the intangible assets "continued to hold the same value through December 31, 2011, even after transfer to Frankford Machinery." *Id.* at 22. Brookworth claims that although Mr. O'Neill testified that the value of intangible assets owned by Frankford Associates on December 31,

---

[24] Brookworth posits: "[i]t was reasonable to conclude that the intangible assets were transferred sometime between July 14, 2011 (the more likely date, that Mr. Gerber testified was the date when Frankford Associates stopped generating income) and December 2011 (the date when Frankford Associates transferred the tangible assets to Frankford Machinery and totally ceased operations)." Brookworth's Brief at 17-18.

2011, would have been done by a liquidation analysis rather than a market approach, such an analysis "would have been totally irrelevant. By December 31, 2011, the subject intangible assets were no longer owned by Frankford Associates and had already been transferred to Frankford Machinery." Brookworth's Brief at 23.

Brookworth also argues that the trial court erred in concluding that the evidence did not establish that Frankford Associates was insolvent. Brookworth argues that the evidence establishes that "as of mid-August, 2011, Frankford Associates became impecunious, unable to have sufficient cash to pay its obligations," Brookworth's Brief 16, but was "insolvent likely from as early as July 14, 2011 when it stopped generating sales income." *Id.* at 18, 19.[25] Brookworth claims that the company was definitely insolvent at the latest by December 31, 2011, as Ronald had testified. Brookworth's Brief at 24.

Finally, Brookworth asserts that Ronald and Nicholas Jr. "stood to profit from Frankford Machinery's significantly enhanced business revenues (freed from Frankford Associates' significant debts) which resulted from their direct effectuation of the 2011 fraudulent transfer of intangible assets from Frankford Associates to Frankford Machinery." Brookworth's Brief at 28.

---

[25] In a footnote, Brookworth contradicts itself by stating that Frankford Associates was likely **not** insolvent in mid-July, but chose to stop operating because of the debt incurred by its lease guarantees. Brookworth's Brief at 19 n.4.

Brookworth claims that Frankford Machinery, with Nicholas Jr. and Ronald as principals, "implemented a pre-planned scheme to defraud all of the creditors of Frankford Associates (including Brookworth), by shutting down Frankford Associates during mid-July 2011 and shifting its business activities and revenues to Frankford Machinery." *Id.* at 27 (footnote omitted). Brookworth contends that the PUFTA allows for joint and several liability, and that shareholders of a transferee corporation can be the subject of equitable relief for a fraudulent transfer. *Id.* at 28.

For ease of disposition, we begin by reviewing the trial court's conclusion that Brookworth failed to prove the existence or value of intangible assets transferred from Frankford Associates to Frankford Machinery. We conclude that this issue is dispositive of this appeal.

"Generally, [the] PUFTA permits a creditor to void a transfer or obligation upon direct or indirect proof of fraud. *See* 12 Pa.C.S. §§ 5101–5110." *Fell*, 125 A.3d at 81. The relevant provision of the PUFTA provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S. § 5105. The PUFTA defines "transfer" as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. The term includes payment

of money, release, lease and creation of a lien or other encumbrance." *Id.* §

5101. "Asset" is defined, with some exceptions inapplicable here, as

"[p]roperty of a debtor." *Id.* "Property" includes "[a]nything that may be the

subject of ownership." *Id.* A debtor violates Section 5105 if "(1) the

creditor's claim arose before the transfer, (2) the debtor made the transfer

without receiving a reasonably equivalent value in exchange for the transfer,

and (3) the debtor became insolvent as a result of the transfer." *Knoll v.*

*Uku*, 154 A.3d 329, 333 (Pa. Super.), *appeal denied*, No. 77 WAL 2017,

2017 WL 2874721 (Pa. July 6, 2017). For the purposes of this section,

> a person gives reasonably equivalent value if the person
> acquires an interest of the debtor in an asset pursuant to a
> regularly conducted, noncollusive foreclosure sale or the exercise
> of a power of sale for the acquisition or disposition of the interest
> of the debtor upon default under a mortgage, deed of trust or
> security agreement or pursuant to a regularly conducted,
> noncollusive execution sale.

12 Pa.C.S. § 5103.

The party opposing the transfer bears the burden to prove the

statutory elements of a fraudulent transfer claim under the PUFTA by a

preponderance of the evidence. *See Knoll*, 154 A.3d at 336 (relying on *In*

*re Wettach*, 811 F.3d 99 (3rd Cir. 2016)). Where expert testimony is

presented, a fact-finder may accept or reject the expert's credibility, and is

free to believe all, part, or none of the expert's opinion. *Nemirovsky v.*

*Nemirovsky*, 776 A.2d 988, 993 (Pa. Super. 2001).

In this case, Brookworth bore the burden to prove to the trial court that assets were transferred by Frankford Associates for less than their reasonably equivalent value. 12 Pa.C.S. § 5105; **Knoll**, 154 A.3d at 336. The trial court concluded that Brookworth failed to meet this burden, and we agree.

Brookworth claims that Frankford Associates transferred "workforce in place, customer lists, internet presence and goodwill" to Frankford Machinery. But Frankford Associates presented no evidence regarding the transfer of a workforce. Rather, testimony established that Ronald Kashkashian had ceased working for Frankford Associates in 2002, when he began working for Frankford Machinery. No evidence established the date that Nicholas Jr. began working for Frankford Machinery, and no testimony addressed the identity or number of other employees working for Frankford Machinery.

The only evidence regarding Frankford Associates' customer list established that the two businesses had similar customer lists. While Brookworth introduced the customer lists for Frankford Machinery between 2009 and 2012, showing an increase in customers during that time period, no evidence was introduced establishing which new customers were former customers of Frankford Associates, if those customers were added from records received from Frankford Associates, or whether those new

customers patronized Frankford Machinery to receive services that historically had been performed by Frankford Associates.

Brookworth did elicit testimony that Frankford Associates may have had "good will" — meaning that due to its years in operation, its name would have been recognized by potential customers. However, no evidence was presented that Frankford Associates' name or logo began to be utilized by Frankford Machinery between July 14, 2011 and December 31, 2011.

Testimony surrounding the transfer of the website was unclear. Either Frankford Machinery had use of the *frankfordonline.com* website well before Frankford Associates went out of business, or Frankford Machinery did not utilize the website until well after Frankford Associates went out of business. The evidence was similarly unclear regarding the progression of ownership or use of *frankfordparts.com*.

Brookworth presented evidence that Frankford Machinery experienced a dramatic increase in profits in the two years following the closing of Frankford Associates, and that Frankford Machinery began servicing dry cleaning equipment and selling replacement parts after December 31, 2011. However, no evidence established that Frankford Machinery began offering such services prior to December 31, 2011, let alone in mid-July 2011, as Brookworth claims in its brief. The financial statements showing the increase in revenue for Frankford Machinery show the profits for all of fiscal years

2011 and 2012, and the record lacks clarity as to whether Frankford Machinery experienced any upswing in business in mid-July 2011.[26]

The expert testimony presented by Brookworth did not establish either that any intangible assets were transferred, or the value of any such assets at the time of transfer. Mr. O'Neill's opinion that intangible assets existed as of June 30, 2011, was based on what he deemed a "market approach" to calculating their value. Using that approach, he found the total value of a company based on an estimated market rate, added the amount of liabilities, and subtracted the cash held by the company and the amount of its accounts receivable; what remained was an estimate for the total value of tangible and intangible assets and inventory, in this case $657,000. But Mr. O'Neill's testimony was inconsistent as to whether this number included the combination of inventory, tangible assets, and intangible assets or just the intangible assets alone, and we note that his June 30, 2011, estimate did not exclude the tangible assets valued at $83,000 that are presumed to have later left the company. Most importantly, Mr. O'Neill's testimony did not identify exactly what the intangible assets were; from his amalgamated number alone it is impossible to determine which assets may have been

---

[26] As noted above, to the extent the record established an increase in profits for Frankford Machinery, Brookworth still bore the burden of establishing that some assets were transferred during the insolvency of Frankford Associates or that their transfer caused the insolvency.

absorbed by Frankford Machinery or the value of those assets, and he testified that he was unable to provide such a breakdown.

That the trial court focused on the expert's failure to opine on the value of the intangible assets as of December 31, 2011, rather than on the now-claimed (but uncertain) transfer-date of "between" July 14, 2011, and December 31, 2011, is of no import.[27] The trial court is correct that the expert simply did not testify to the value of the intangible assets (or, rather, the combination of tangible and intangible assets and inventory) following June 30, 2011. Despite Brookworth's assertions, Mr. O'Neill did not say that his estimated value of intangible assets based on the market approach and the 2010 tax returns would remain constant for the following year. To the contrary, Mr. O'Neill testified that a change in the revenue of the company or a change to the amount of cash on hand would affect the top-down calculation of intangible assets. And, if the company were to close or to cease generating revenue, as it did, Mr. O'Neill testified that the market approach would not even be the appropriate tool to yield a valid estimate for intangible assets.

Given the foregoing, we cannot say that the weight of the evidence is contrary to the verdict or that the verdict shocks the conscience of the court. *Lanning*, 803 A.2d at 765-66. We conclude, as did the trial court, that

_____

[27] We note that Brookworth inconsistently asserted in its opening statement at trial that the operative date of the transfer was December 31, 2011, and is therefore in part to blame for any resulting confusion.

Brookworth failed to carry its burden to prove by a preponderance of the evidence that any intangible assets were transferred to Frankford Machinery for less than their reasonably equivalent value, and we affirm the judgment of the trial court on that basis.[28]

Judgment affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/26/2017*

---

[28] Because we conclude that the weight of the evidence does not establish that a transfer of intangible assets occurred, we need not address whether the evidence established the other statutory requirements necessary to prevail on a claim of fraudulent transfer.